The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, good morning, everyone, and welcome to the October session of the Fourth Circuit. And Judge Quattlebaum and I, in particular, want to welcome Judge Gallagher and appreciate you serving with us this morning. And so we'll hear argument in our first case, Flexi-Van Leasing v. The Travelers Indemnity Company. Mr. Pritchard. Yes, ma'am. Please, the Court. Your Honor, can you hear me? Yes. Okay. Do you mind if I use my timer on my phone since I don't have a timer like I would normally have? Can you see the timer on the screen? No, ma'am. I cannot. Okay. Well, use whatever timer you need, and I can see the timer on the screen, so I'll be sure to keep track of it for you. I'll be able to keep track. Thank you. This is a very complicated matter, which arises out of an intermodal chassis accident. And my client, Flexi-Van Leasing, is in the business of doing two things. One, it leases chassis to shipping lines and others, and it maintains its own fleet. And two, separate and apart from that, it manages intermodal chassis pools, which are collections of chassis which various different shipping lines and others contribute to, and they can pull chassis in and out of the cooperative pool, and they keep a scorecard, Flexi-Van keeps a scorecard of who has it and for how long, and at the end of each month, they settle it up. The chassis in question, oddly enough, was owned by Flexi but was on a long-term lease to Zim Shipping Line, which was contributed to the South Atlantic Chassis Pool, which was the IEP, the Intermodal Equipment Provider, meaning basically it was the owner of the chassis for all intents and practical purposes under the federal statutes. And the chassis had been removed from the pool by HIPAA so that it could use a box from the- You know, Mr. Pritchard, you can use your time however you'd like, but I think, I'm sure everybody's aware of the factual background, if you'd like to get into your legal arguments. Yes, ma'am. I will. Well, first, I think the court erred in finding the judicial admission in paragraph four of the complaint, which is sort of central to this whole case, is whose law applies, South Carolina or New Jersey's? Well, the complaint did say that South Carolina law applies, didn't it? There's no denying that that is said in the complaint. It says it straight up, but it's well settled that judicial admissions are a question of law, and, excuse me, the judicial admissions apply to fact and not law. Conclusions of law are not subject to judicial admissions, and choice of law is- Judge Quattlebaum has a question. Sure. Yeah. I tried to talk and was muted, so I apologize. Mr. Pritchard, I appreciate you're correct that judicial admissions are about law. Arguably, the second sentence of paragraph four could be construed as a question of law. What about the first sentence of paragraph four? One word, I don't have it in front of me. Would you read it, please? I'm sorry. Yeah, I'll be glad to read it. This case involves a policy of insurance issued by travelers, which ensures interest in South Carolina. I think that, in and of itself, is a question of law, and I don't think it does ensure interest in South Carolina. And I think that's central to this question, I think, is that a question of law? And I believe it is, whether or not it is- If I could just follow up, I appreciate ... Let's see if I can break that down. One issue with regard to that is, is that a question of fact or law? And the second question would be, is it true, is it correct? It seems to me those are separate issues. I think I understand both arguments, but do you agree just generally with what I said, that those are two separate questions that we have to look at? I would agree. And I think- Okay. The answer to the first- What's the best case you have for the language in the first sentence being a question of law? Well, whether or not it ensures an interest in South Carolina is a question of law. Just like citizenship or policy, contractual interpretation, et cetera, I think the question is, is it an interest in South Carolina, is it in and of itself a question of law? And so the answer to the second question is, I don't think it does. I think it is a question of ... I think it's a question of law, and I think that the court needs to overturn that aspect of the holding, because I don't believe under the factual scenario presented and under the law presented, that it is in fact a policy of insurance ensuring interest in South Carolina, because the insureds are in Kentucky and in New Jersey, and the And so they don't have any fixed situs, really, if you think about it. It could be in Charleston right now, and it could be in ... I'm sorry, somebody asked a question. Do I- Yeah, if I could ... That's a good question. I mean, if really on the question of whether you're relieved from a judicial admission, we, I think, addressed that question, and the focus on the chassis, I appreciate that argument. That may make that like the Russell case, for example, but is that the only way to look at it? I mean, there is a location in Charleston, and is at least part of the interest being insured the management of the locations, one of which is physically in Charleston? Does that differentiate this case from Russell, for example? No. No, and here's why. The depot that FLEXI maintains in Charleston, all it does is it leases its particular chassis in and out, and in and out, usually for short periods of time. For instance, if you've got a particularly heavy haul, we have what we call FLEXI day. So if you're carrying, say, rocks, or tile, or something very, very heavy, you wouldn't maintain a chassis like that in a pool, typically. So you just lease it for a very short period of time. The chassis in question was actually belonged to the pool. It was actually the pool's chassis, and the pool was its IEP. That's registered, that's a governmental question, it's just what it is, like titling a vehicle. The chassis itself, I don't know that it ever touched FLEXI's facility in Charleston, or any other FLEXI-owned facility, because the way these pools work is they actually work on the Ports Authority terminal. So it's almost like, okay, I'm going to drop the chassis in the Walmart parking lot, and you come pick it up when you're ready. It's sort of the same concept, and it doesn't go on at a FLEXI facility. And most of the work that pertains to the actual chassis pools actually goes on in New Jersey. It's basically an accounting function at the end of the day. Periodically, one would go out and spot audit the chassis on location at the Ports Authority terminal. And the reason one would do that is, particularly in this industry, there's a great deal of fraud with vendors. They'll say they put on a tire, and they didn't really put on a tire, and they'll bill it. And I mean, you go out to some of these pools, I mean, it's millions of dollars in loss. But they'll periodically go spot audit the chassis to make sure that the vendor's invoice serial number matches up to the chassis tire, or that there really was a light put in there, or that sort of thing. But really- Ms. Gallagher has a question. Yes. Because you made the statement you made in paragraph four that Judge Quattlebaum was talking about earlier, though, wasn't Travelers in Effect deprived of the opportunity to take a risk? Not necessarily. I mean, I don't think that there's anything that would really change this analysis one way or the other. I don't think that there's anything that would have gone on there that could in any way change this. It is what it is. I mean, the chassis is titled where it's titled. The IEP is what it is, which is a matter of public record. It's relationship to Interstar is what it is. Interstar's relationship to Mr. Vitito is what it is. I mean, there's just really nothing there. The factual patterns really are, to the extent there is a factual pattern, it's set in stone. There's no discovery that really could have taken place that could have changed this analysis in any way, shape, or form. Mr. Pritchard, I have a question. Because your time's running low, I have a question about exclusion G. Yes, ma'am. Your brief at page 57 says that Appellee failed to remove exclusion G after having been instructed to do so. Curiously, there's no JA cite there.  I guess, ma'am, I can't. If you would give me a minute while Mr. Davis argues, I'll give it to you in my rebuttal. But essentially- Good. Go ahead. When Interstar contacted Dole, Traveler's agent, to procure the policy, they sent them the Exhibit B and said, we need coverage just like this. Exhibit B, section 1.4 says, the automobile exclusion must be removed. And it was not removed, unbeknownst to anyone. In fact, I'll even see if I can find this. I know it's in there. There's an email from Interstar when all this starts coming down. Basically, the president of Interstar says, what have I been buying? Because that's my whole business model. If you put this in section, then this policy doesn't even cover me. So that's where the trouble lies. This exclusion essentially negated all coverage to both Interstar and Flexi. And that's where the whole problem lies. Flexi was perfectly happy with Traveler's for two and a half years. And you didn't know that the exclusion was in there. Traveler's never said word one. And then all of a sudden, after two and a half years of this, boom, we get a reservation of rights letter for the first time, which lets everybody know that this exclusion's in the policy. Now, I mean, presumably Interstar should have known, because they'd have had a copy of the policy. But I don't represent Interstar, and I don't know what their thought process was. But Flexi only got a certificate of insurance, which is sort of standard in the industry. And so Flexi had every reason to believe that Interstar was providing the coverage that was requested. And frankly, based on the emails from Gold, Interstar had a reason to believe that it didn't have an exclusion G in there. So, yes. Just to follow up on that, whether or not there's some issue about that exclusion, I appreciate the significance of that to coverage, and I appreciate the concerns. But does that create, I mean, it's still at the point we're in as a reservation of rights situation, and how does that create a conflict under Twin Cities? Well, at that point, Bernie Vaughn, who was then the executive vice president, starts insisting that Interstar be brought in as a third party for not providing the coverage that was required. At that point, and where everything started going off the rails, and I've got it right here if you want the actual site, they're told by Mr. Wall that he takes his instructions from travelers, not Flexi, and that travelers won't authorize him to bring Interstar in as a third party. I believe my time is about to end, as a third party. So at that point, that's when the wheels come off. That's when Mr. Vaughn says, well, wait a minute, I'm the client here and you're supposed to do what I'm telling you to do, but you're telling me that you take your instructions from travelers. And that's when he says, enough is enough, and that's when he starts asserting the New Jersey law thing. All right. Judge Quattlebaum, or Judge Gallagher, do you have other questions? Not for now. All right. Mr. Pritchard, I realize you were answering Judge Quattlebaum's question, and I appreciate that.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.   Any other questions? No. So you can look for those sites. That's it. Thank you. All right, Mr. Davis? Thank you, Your Honor. Good morning. As has already been alluded to, this case has been going on for quite some time. A lot has been written, many, many pages. But I would submit that really what it all boils down to is that the issues are pretty straightforward and simple. After all the briefing, I think Mr. Pritchard has done a good job of laying out what the issues are, and I'll take them one at a time. The first one is whether or not there was a judicial admission. I would point out that there's law that says that a simple mistake, if a clerical error or something like that, can be corrected. But here, it's really an unequivocal statement that South Carolina law governs, and it even cites to the South Carolina statute concerning the choice of law. So we would submit that there was no mistake here, and that if there was ever a judicial admission, this is it. They've admitted that South Carolina law governs, and aside from the judicial admission, it does govern. After all, notwithstanding the argument about how these trailers move around the country, which is true, the cases that talk about, in the choice of law context, the fact that are inapplicable to this situation, because the trailer in question was not transient at the time of the accident. It was disabled and was being repaired, and it was in a facility in Charleston, and I think it's important to point out that Flexivan is kind of wearing more than one hat here because they were also the administrator of this pool whereby trailers were shared. And so these operations with regard to the port of Charleston were conducted out of Charleston, and so there is a connection to South Carolina which justifies the application of South Carolina law. And I submit that, therefore, the allegation and the complaint to that effect is exactly correct. Judge Quattlebaum has a question. Yes. Mr. Davis, on that point, I'm trying to make sure I understand this as best I can, because I think it, you know, maybe, certainly if there's no judicial admission, this would be a question. Maybe it would be a question on whether to relieve Flexi of an admission if there was one. But so I'm trying to understand this location in Charleston. What's the connection of the location in Charleston to the claim here? Was the injury to the independent contractor who was doing the work, you know, did that happen at that location, or did he pick it up from that location, and is that in the record? I believe it is in the record, Your Honor, and I don't believe Mr. Pritchett will disagree with me, but I'm sure when he speaks again, if he does, he'll say so. But my understanding is that there is a facility where these trailers, the trailers are essentially shared as a matter of efficiency. And so, and there, as I understand it, there are various locations where they are, can be, I guess, stored, for lack of a better word, so that the various trucking companies can share them. And this particular one had the mechanical problem, and so a local repairman went out to repair the wheel, and that's when the accident happened. It happened there in Charleston at the holding facility. Okay, that's, that last point was the question I was getting at. Thank you. I believe that's the term that they've used, holding facility or holding something like that, but that's the way I understand it worked. So, again, we strenuously would argue that because not only of the clarity of the admission and the complaint, but its reference to the South Carolina statute and the connection to South Carolina that I just described, that regardless of the judicial admission, South Secondly, you know, New Jersey really has no real contact with this dispute. The incident happened in South Carolina. We're talking about the performance of the contract. That's what's at issue. So, again, we strenuously submit that South Carolina law governs. On the third point in the statement of issues for appeal, the argument is that the district court erred in holding that Flexivan must prove that there's an actual conflict before it's appropriate that counsel withdraw. And I would submit that, as is stated in the briefs, there's no law to that effect in South Carolina. In fact, it's, while there's no law on point in South Carolina, the procedure that's been followed here for certainly the 40 years that I've been practicing law on the district. If there's no law on point on that in South Carolina, shouldn't we certify a question to South Carolina about that? Well, your honor, that I certainly would not argue against that. We do have some federal cases as referenced that address that, but it is true that, to my knowledge, there's no case that specifically indicates what the duties are in that situation. I would point out a quote that I really liked in one of the cases. The court will bear with me just one moment. This is from the Twin City case where the court said, quote, we are unable to conclude that the Supreme Court of South Carolina would profess so little confidence in the integrity of the members of the South Carolina bar. And I think that's a fair and true statement. It's well known among the defense bar here that when defending an insured, that the insured is your client. We certainly instruct our young associates to that effect and that there's a duty to put that client's interests above the insurance company's. And if there is a conflict, for example, if information is learned that could jeopardize coverage, then that is not to be revealed to the insurance company. So, I think that's a strong statement from that case. But certainly, I'd have to admit that there's nothing I'm aware of that's on point from the South Carolina State Appellate Court. And with regard to the exclusions and the way that travelers handle the defense of this, certainly they reserve their rights. But I would point out that although this exclusion G was referenced in one of the exclusions, travelers did what it was supposed to do. They reserved their rights. They hired a very good lawyer who was defending the case. That lawyer was asked to do something beyond what the insurance company had asked him to do. Excuse me, Judge Gallagher has a question. Yes. Doesn't the breadth of exclusion G, though, come close to equating to a denial of coverage? It is a fairly broad provision under the context that was being looked at here. Your Honor, I agree that it is a broad exclusion. But I guess my response to that would be that although it is a broad exclusion, all that happened is that the insurance company travelers put the insured or the additional insured on notice of it, but they never denied coverage on that basis. They simply were dotting I's and crossing T's, as they should do, in putting the insured on notice of any exclusion that could at some point possibly be applicable. But again, travelers never relied on it. All they did was to reserve their rights. Following up on that, I'm trying to... Certainly there is an important issue of coverage that is implicated by the reservation of rights and so if that's the case, is that the issue, though? Isn't the issue whether or not Mr. Wall is able to represent FLEXI in this case? Isn't that the primary... There's a difference in whether there's coverage and whether he is willing to represent the defendant, it seems to me. Is that correct? Yes, Your Honor, and I do agree with that. And certainly Mr. Wall was hired by travelers and was being paid by travelers. But, and this sort of goes back to the point I was making earlier, his client was FLEXI. And so he was hired to do his best to defend them and was doing so until he was fired. The conflict arose when FLEXI insisted that he assert a cross claim. And I want to emphasize that Mr. Wall did not refuse to do that. His response was that he would be happy to do that, but that the insurance company would not pay him to do that because his job, according to what he was hired to do by travelers, was to defend the case, not assert a cross claim. But he did say that he would do it if FLEXI ban would pay him to do it. And rather than do that, they fired him. And so I would submit that travelers did what it was supposed to do. They hired competent counsel. They were to pay him. And they couldn't control the fact that their insurer or the additional insurer decided to fire him and not to pay him. I'm sure it's not a situation where FLEXI ban couldn't afford to pay him. So that was their choice. They could have paid him to pursue that cross claim if they had wanted. Instead, they chose to fire him. And that's how we've ended up years later where we are now. Um, so, uh, continuing with my argument. Yeah, again, I really can't improve on Judge Norton's orders. He really, in those orders, that's our position. As he said, you know, there was a hypothetical conflict, but there's no basis under South Carolina law that the failure to bring a third party cause of action creates a conflict that requires termination of the relationship. And of course, I think he cited that Twin City case. So, you know, all things considered, our position is that travelers acted entirely appropriately and in accordance with the law and custom. Hiring a very good lawyer who was pursuing the defense actively. And this whole problem in all these years of litigation arose because FLEXI ban, instead of choosing to retain Mr. Wall to pursue that cross claim, chose to fire him instead. And retain a new counsel. That's where the problem arose. If they had just done what he had suggested, then they could have challenged Travers' decision, if there had been a decision, not to pay him to do that in a separate suit. So, as far as we're concerned, that's a situation where they made their bet. So, I see I have time left, but I think I've addressed most of the main points I wanted to make. But I'm certainly happy to entertain any other questions. Judge Quattlebaum or Judge Gallagher, do you have further questions? No? All right. Thank you, Mr. Davis. We understand your argument. Thank you, ma'am. And we'll hear again from Mr. Pritchard. I can now see the timer on the screen has come up. In response, Your Honor, to your earlier question with regard to references, starting on page 491, there is an email of 9-24-2009 from Interstar to W.P. Dole, where they say, please see the attached agreement. And so, unfortunately, you have to run through several pages beyond that to know what the whole agreement is. But the entire agreement is actually the master bank and CASSI agreement. And that basic email chain ends on page 509. Then on 510, they note that they faxed it. So, you jump a couple more pages. And then starting on page- That they faxed what, the agreement? Well, exhibit B, which is the- And exhibit B is what? That's the, to the master maintenance CASSI agreement, which sets forth the insurance requirements. Okay. And so, where is it that, in the record, that shows that Apelli failed to remove exclusion G after having been instructed to do so? Because that's what your brief says. Yes, there are two places. On page 520, that's the fax, I'm going through it, to 521, where they actually faxed the exhibit over. That's where they were instructed to do so. It's all in that chain that I just cited for you. Then, you jump a few more emails later. And, on page- It's unfortunately a series of things that you have to go back and forth between to get to pretty quickly once you read it. Get me to the next page, which is important. Okay. So, we have to, we need to piece together these various faxes and emails to find where they were quote, instructed to remove exclusion G? Yes. I just gave you the email site, I mean, the page site, where they sent the exhibit B over and said, we need insurance that conforms to this. And then, on page 535, Dole responds on the same day in an email where they say, jump through it, and it says, here's the certificate of insurance. And, they go down and they say, at the bottom of the paragraph, at the bottom of the page, I'm not sure what item 1.4 references. And, you do not have an exclusion for this, but not sure if there's any way for you to verify your subcontractors do not. So, they've acknowledged that they've seen this section 1.4. Well, the fact that that reservation of rights letter of March 27, 2013 was written, bringing up exclusion G is indicative of the fact that Travelers never removed it. And, it's in the policy, it's at the beginning of the record, exclusion G is right in there. And, that's why they raised it at the beginning of the letter. So, they were told to take it out. Right. I'm not, I see that it's not taken out. It's just not as readily apparent to me, and perhaps I need to look through more closely what you've just cited. It's just not as readily apparent to me that they were, quote, instructed to take it out. But, regardless, Mr. Davis said that his client did not rely on exclusion G to deny coverage. What's your response to that? My response to that is, I think that's somewhat illusory. I mean, I have struggled to believe that after two and a half years of being involved in this case, suddenly one day they just woke up and went, aha, maybe we just thought I'd just throw this out there. I mean, at this point, now they're starting to figure out that they've got a fairly significant brain injury case, and that they've got an exclusion that's going to get them out of it. I mean, why bother to write the letter if you're not going to rely on it? It was pretty clear where this was headed. I mean, I don't think anybody, I would love to present to a jury, I'd love to hear them to explain that they threw that reservational rights letter out there, but, nah, they were just kidding. I mean, they meant it. And, I think it's pretty obvious to all concerned that they meant it. They wouldn't have raised it if they didn't think they had a valid basis for denying coverage on a multi-million dollar brain injury case. I think that's ultimately where this went. Judge Quagmire, just to clarify the chassis and where it was, it was actually on Intermodal Bridge Transport Yard, that's IDT. They are an intermodal drage company. They had outgated the chassis from the port about three or four days before. Taking the box up to North Carolina on that chassis, the box had been stuffed with, I believe, paper, rolls of paper. And it had gone back to the IDT yard. No one knows quite when the tire went flat. Probably went flat on the way back. The driver might not know. He grounds it in the yard. They have to move that chassis and box over to the port that morning because he's going to get on a ship and go to Antwerp. And during the process of going to get the box and the chassis, the driver discovers that the tire's flat. So that's when they call Interstar, who calls Mr. Vigato, who comes to fix it. And so he can then go to the port and then go on the ship and then go over to Antwerp with the paper in the box. That is, the chassis will, of course, be left at the port until it got outgated again. So that's what happened. So it was, was the work done to fix it once it got back to the holding area or the port or whatever the actual name is? Well, IDT's yard. IDT actually had possession of the chassis at that time. They were hired by Lloyd to move a box from Charleston to North Carolina and then back to Charleston so that they could go on a ship. And so IDT, the driver got in at night and nobody was there. Just grounded the box and left, which is not uncommon because you can't get on the port at five o'clock. But you can get in and out of the intermodal dredge lot all hours of the day and night if you've got the access to it. And that's the service that they provide as an intermodal dredge company. That's what really happened there. Thank you. Thank you. All right. Thank you. Thank both council on behalf of the panel. We appreciate your arguments here today and the time you've, the extra time you've taken to address our technological needs in this time of pandemic. And we wish you a good weekend. Thank you. Thank you and we'll move on to our next case. Thank you. Thank you. The court will take a brief break before hearing the next case.
judges: Stephanie D. Thacker, A. Marvin Quattlebaum Jr., Stephanie A. Gallagher